EHRENREICH PHOTO-OPTICAL INDUSTRIES, INC., PLAINTIFF *v.*
UNITED STATES, DEFENDANT

Court No. 76–5–01308

Before BERNARD NEWMAN, *Senior Judge.*

(Decided March 26, 1986)

*Serko & Simon (Joel K. Simon* and *George S. Locker, Esqs.,* of counsel), for the plaintiff.

*Richard K. Willard,* Assistant Attorney General; *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Commercial Litigation Branch; and *Judith M. Barzilay, Esq.,* for the defendant.

BERNARD NEWMAN, *Senior Judge:*

### INTRODUCTION

This action presents for determination the proper classification, and hence rate of duty, for certain photographic enlarging printers imported by plaintiff from the United Kingdom and entered through the port of New York during the period of June 1973 through September 1975.[1] In liquidating the entries, Customs classified the imports as photographic enlargers under item 722.18 of the Tariff Schedules of the United States (TSUS), as modified by T.D. 68–9, and assessed duty at the rate of 7.5 percent ad valorem.[2] Relying on *United States* v. *E. Besler & Co.,* 64 CCPA 121, C.A.D. 1193, 557 F.2d (1977), defendant proposes as an alternative classification that the merchandise is dutiable under the provision for certain cameras in item 722.16, TSUS, as modified by T.D. 68–9, at the rate of 7.5 per-

---

[1] Specifically, the imports comprise four models of Durst printers: ACS M 5/8 Miniprinter; ACS 78 MK2 Type O; M 6/12; and M 5/8 Type O. There are no material differences between these models for tariff classification purposes (Tr. 27).

[2] At the trial, plaintiff abandoned its claims with regard to entry No. K157732, which was one of the entries covered by the summons and complaint (Tr. 16). Plaintiff also abandoned the action respecting "various and assorted parts" covered by entry No. K232375. *Id.*

cent ad valorem. Plaintiff claims that the imports are properly dutiable under the provision in item 722.94, TSUS, as modified by T.D. 68–9, for equipment specially designed for photofinishing, not specially provided for, at the rate of 5 percent ad valorem.

The court finds that the merchandise was properly classified by Customs under item 722.18.

STATUTES INVOLVED

19 U.S.C. § 1202, Tariff Schedules of the United States:

*Classified under:*
Schedule 7, Part 2, Subpart F:
   Photographic cameras (other than motion-picture cameras), photographic enlargers, and combination camera-enlargers:

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

722.18          Other enlargers and camera-enlargers ............................ 7.5% ad val.

*Defendant's Proposed Alternative Classification:*
Schedule 7, Part 2, Subpart F:
   Photographic cameras (other than motion-picture cameras), photographic enlargers, and combination camera-enlargers:

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

Other cameras:

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

   Other than fixed-focus

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

722.16          Valued over $10 each .............. 7.5% ad val.

*Claimed under:*
Schedule 7, Part 2, Subpart F:
   Equipment specially designed for photofinishing (still picture):

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

722.94          Other, not specially provided for ................................ 5% ad val.

FACTS

The record in this case comprises the testimony of three witnesses on behalf of plaintiff and three witnesses for defendant. Additionally, each party submitted various exhibits; the official entry papers were received without marking (Tr. 19).[3]

---

[3] At trial and in its reply brief, plaintiff alluded to defendant's affirmative response to plaintiff's request for an admission that the imports are other than enlargers (Tr. 3–4, 110–111). The court reminded counsel of an order of March 6, 1985 denying defendant's motion to withdraw its admission (Tr. 5, 109–110). However, at trial plaintiff did not offer defendant's admission into evidence, but rather submitted testimony and other evidence on the issue of whether the imports are enlargers, and did not object to defendant's evidence on that issue. Since defendant's admission was neither offered nor received in evidence, the admission is not part of the record in this case. *Avant* v. *Polaroid Corp.*, 441 F. Supp. 898 (D.C. Mass 1977), *aff'd*, 572 F.2d 889 (1st Cir. 1978), *cert. den.* 439 U.S. 837 (1978) (Rule 36 admissions not introduced into evidence by plaintiff would not be considered by the court.). *Cf. S.G.B. Steel Scaffolding & Shoring Co., Inc.* v. *United States*, 82 Cust. Ct. 197, 204, C.D. 4802 (1979) ("* * * to be considered by the court, answers to interrogatories must be introduced into evidence and cannot merely be judicially noticed."). Accordingly, the court cannot agree with plaintiff's contention that defendant's admission is conclusive of the issue of whether Customs' classification was correct.

The pertinent facts are:

The merchandise in controversy consists of Durst printers, which are automated machines designed to optically produce color photographic enlargements, called "prints", of the image on a photographic negative at high speed. Following is the basic process by which the imports print photographic enlargements: Under darkroom conditions, the operator of a printer loads it with photosensitive positive paper on which exposures will be made. The printers have a built-in paper transport mechanism that holds the photosensitive paper. A photographic color film negative is placed in the negative carrier of the printer. The operator then presses an "exposure" button to activate the machine. Durst printers have a light source, that when activated during printing, emits light through the photographic negative and then through a lens onto the positive paper.

The high speed printing process is automated and is not viewed by the operator. The end product produced by the imports is called a "print", which may be as large as 11 x 14 inches in size. Such print consists of the *photographic positive containing a latent image* which is not visible in normal room light, and must be finished by chemical processing to produce a viewable image in the form of what is ordinarily regarded as a "photograph".

### Discussion

Defendant contends that based upon their primary design, construction and function, Durst printers are encompassed by the common meaning of the term "enlarger", and are also included within the dictionary definition of "camera" as articulated by the Court of Customs and Patent Appeals in *Besler, supra.* Respecting plaintiff's claim, defendant argues that the imports are not classifiable under item 722.94 because they do not finish the photo; and even assuming that the printers are photofinishing equipment, by virtue of General Interpretative Rule 10(c) they are more specifically provided for, either as cameras or enlargers.

Relying on the principle of "commercial designation", plaintiff insists that Durst printers are not known or regarded in the photographic industry as enlargers or cameras, but rather as "printers". Plaintiff also argues that the imports are not designed nor do they function as enlargers within the common or commercial meaning of that term, but are "more than" enlargers. In support of its claim under item 722.94, TSUS, plaintiff asserts that Durst printers are known and used as photofinishing equipment.

*Common Meaning*

Resolution of the classification issue in this case requires a determination of the meaning of the *eo nomine* provision for "enlargers" as that term is used in item 722.18, TSUS. Fundamentally, in the absence of a special commercial designation, the language of a tariff provision is to be construed in accordance with its common mean-

ing. The common meaning of a tariff term is a matter of law to be determined by the court; and in making such determination, the court may rely upon its own understanding of the word or term used and may consult standard lexicographic and scientific authorities. The testimony of witnesses respecting common meaning may properly be considered by the court, but such testimony is advisory only and has no binding effect on the court. *United States* v. *Corning Glass Works,* 66 CCPA 25, C.A.D. 1216, 586 F.2d 822 (1978); *United States* v. *E. Besler & Company,* 64 CCPA at 124; and *United States* v. *National Carloading Corp.,* 48 CCPA 70, C.A.D. 767 (1961).

In support of its position that the printers fall within the common meaning of the term "enlarger", defendant cites:

*Webster's Third New International Dictionary* (1963), p. 754:

> One that enlarges, *specif.:* an optical projector used to produce a photographic enlargement.

In addition to the foregoing lexicographic authority, the court has consulted:

*McGraw-Hill Dictionary of Scientific and Technical Terms* (3d ed. 1984), p. 546:

> enlarger [OPTICS] An optical projector used to project an enlarged image of a photograph's negative onto photosensitized film or paper. Also known as a photoenlarger.

and

*McGraw-Hill Encyclopedia of Science & Technology* (5th ed. 1982), Volume 10, p. 212:

> Contact and projection printers. Negatives provide the primary records of photography in the black-and-white field and to an increasing extent in color. In many cases, such as the document reproduction field, they may be more useful than the positives. In general, however, positive prints are required, and such prints are made from negatives in contact printers and projection printers (enlargers).
>
>      *      *      *      *      *      *      *
>
> *Projection printers (enlargers).* These are optical projectors consisting of a lamp house and light source, a holder for a negative, a condenser or diffusing sheet, a projection lens designed to give optimum quality at relatively low magnifications, means for focusing for the desired magnification, sometimes automatically coupled to ensure good focus at all magnifications (autofocus enlargers), a support for the optical components, and a board or easel to carry the sensitive paper * * *. Projection printers may expose individual paper sheets or rolls of paper from single negatives or rolls of negatives.

Defendant insists that the component features and function of Durst printers coincide completely with the common understanding of the term "enlarger". Thus, defendant points out that the printers

have a light source, a negative holder or carrier, a method of diffusing light, a lens, a means for focusing (or prefocusing), a support for the optical components and an easel which serves to hold or carry the photosensitive paper. Significantly, four of the witnesses who testified at the trial agreed that Durst printers fall within *Webster's* definition, *supra* (Tr. 88, 126, 227–28, 273–74). Consequently, the court is persuaded that Durst printers are, by design and function, photographic enlargers within the common meaning of that term, as contended by defendant.

In essence, plaintiff's position is that the provision for enlargers in item 722.18, TSUS, is limited to certain prototype hand-operated machines, which are more flexible in operation for certain specific uses than plaintiff's automated high speed printers. While it is true that the imports are automated machines rather than prototype hand-operated machines, this difference does not affect their classification. It is fundamental that an *eo nomine* designation without limitation or legislative intent, judicial decision or administrative practice includes all forms of the article. *National Carloading Corp., supra; Nootka Packing Co.* v. *United States,* 22 CCPA 464, T.D. 47464 (1935). On that score, the evidence of record clearly demonstrates that the imports possess the same basic components and function as hand-operated enlargers and are essentially "automated high-speed enlargers" (Tr. 129, 279–80, 302). Accordingly, the imports fall within the *eo nomine* provision for enlargers in item 722.18.

Plaintiff also seeks to exclude these imports from the common meaning of "enlarger" under the "more than" doctrine. That doctrine was succinctly articulated in *Robert Bosch Corp.* v. *United States,* 63 Cust. Ct. 96, 103, C.D. 3881 (1969):

> The principle is well settled that where an article is in character or function something other than as described by a specific statutory provision—either more limited or more diversified—and the difference is significant, it cannot find classification within such provision. It is said to be more than the article described in the statute * * *. *By contrast where the difference is in the nature of improvement or amplification, and the essential character is preserved or only incidentally altered, the applicable rule is * * * that an unlimited eo nomine statutory designation includes all forms of the article in the absence of a contrary legislative intent or commercial designation.* [Citations omitted; emphasis added.]

And as observed in *United States* v. *Texas Instruments,* 67 CCPA 57, 63, C.A.D. 1243, 620 F.2d, 269, 271–272 (1980):

> Only the most general of rules can be ascertained from the previous decisions dealing with the "more than" doctrine, and it appears that each case must in the first analysis be determined on its own facts. *E. Green & Son (New York), Inc.* v. *United States,* 59 CCPA 31, 34, C.A.D. 1032, 450 F.2d 1396, 1398 (1971) * * *.

In *Green, supra,* the Appellate Court further observed, 59 CCPA at 34:

> * * * In order to determine if an article is more than that provided for in a particular tariff provision, it is necessary to ascertain the common meaning of the tariff provision and compare it with the merchandise in issue.

*See also Ozen Sound Devices* v. *United States,* 67 CCPA 67, C.A.D. 1246, 620 F.2d 880 (1980); *The Englishtown Corporation* v. *United States,* 64 CCPA 84, C.A.D. 1187, 553 F.2d 1258 (1977).

Plaintiff's "more than" argument is predicated on various differences pointed out by its witnesses between prototype hand-operated enlargers and the automated Durst printers. Notwithstanding these differences, the court must observe the well settled rule that merchandise is to be classified on the basis of its primary design, construction and function. *See e.g. Asea, Inc.* v. *United States,* 7 CIT 128, Slip Op. 84–28, 587 F. Supp. 1072 (March 29, 1984), *aff'd* 3 CAFC 34, 748 F.2d 676 (1984); *United States* v. *Oxford International Corp.,* 62 CCPA 102, C.A.D. 1154, 517 F.2d 1374 (1975); *Trans-Atlantic Company* v. *United States,* 60 CCPA 100, C.A.D. 1088, 471 F.2d 1397 (1973).

The record is replete with testimony demonstrating that Durst printers have the same primary design, construction and function as prototype enlargers:

An enlarger's primary function is to produce photographic enlargements referred to as "prints"; a Durst printer has the same primary function and its end product is also referred to as a "print." An enlarger and a Durst printer, in addition to performing the same function, are utilized at the same point in the process of producing photographs from negatives. An enlarger enlarges the image on a photographic negative by projecting a light through a photographic lens onto photosensitive positive paper; a printer operates in the same manner and in fact uses the same paper as that used in an enlarger. In a Durst printer, the negative is placed between the light source and the lens, as it is in an enlarger. The lens in a Durst printer and in an enlarger is located between the negative and positive paper. A Durst printer and an enlarger have a negative carrier and also an easel or similar device that holds the photosensitive paper. A Durst printer and an enlarger have a mechanism for holding the elements at an exact designated distance from each other.

In an enlarger, the printing process takes place in the dark; in a Durst printer, the printer process also takes place in the dark, *viz.,* within an enclosed box.[4] If the printing process in either an enlarger ora Durst printer were exposed to light (other than from the machine itself) during operation, the image on the print would be totally exposed and the print ruined. The end product produced by an enlarger contains a latent image that is not visible until after the

---

[4] As previously noted, Durst printers are loaded with photosensitive paper under darkroom conditions.

print undergoes chemical processing to produce a viewable photograph; the same is true of prints produced by a Durst printer.

Plaintiff seeks to differentiate the imports from enlargers, for Customs classification purposes, on the basis of what essentially amounts to a trade-off between the automated and relatively high-speed printing characteristics of the imports[5] and the flexibility characteristic of traditional enlargers in controlling and manipulating the appearance of the prints, *e.g*, dodging, burning in and cropping.[6] On the basis of their *primary* design, construction and function, however, the imports are nothing more or less than automated high-speed photographic enlargers (Tr. 129, 302), as claimed by defendant. The facts that a traditional or prototype hand-operated enlarger is not used for high production printing, has controls to move the head and bellows, uses a blended light in a single exposure for each print rather than a triple exposure utilizing different colored lights, is used under darkroom conditions, requires a skilled operator and may produce special lighting effects, do not exclude the imports from the common meaning of the term "enlarger" (Tr. 324–25).

The further fact that Durst printer have a built-in paper transport ("roll easel")[7] does not make them more than enlargers since enlargers, by definition, customarily posses an easel or similar device for holding or carrying the photosensitive paper (Tr. 130). *See McGraw-Hill Encyclopedia of Science & Technology, supra.* Plainly, the *built-in* easel of the Durst printer is an integral part of the machine (Tr. 229), and is subordinate and incidental to its function of producing enlargements or prints. The court is far from persuaded that the built-in easel of Durst printers makes them combination articles, as contended by plaintiff, or that the easel gives the printers a use that is not possessed by enlargers. *Cf. Simon Omega, Inc.* v. *United States,* 83 Cust. Ct. 14, C.D. 4815 (1979) (phototypesetting machines capable of photographic enlargement incidental to their typesetting use, held more than simply "enlargers" within the purview of item 722.18, TSUS).

*Commercial Designation*

Plaintiff's main thrust is that in the photographic industry the term enlarger does not encompass "printers". Therefore, the court now considers plaintiff's argument that the tariff provision for photographic enlargers in item 722.18 must be construed in accordance

---

[5] The speed of the subject printers ranges from approximately 200 to 500 prints per hour (Tr. 30).

[6] "Dodging" is a technique whereby light is "held back" from a certain portion of a print during exposure, while the remainder of the print is being exposed (Tr. 147). "Burning in" is a technique whereby light is concentrated on a particular portion of a print while being "held back" from the rest of the print. Both dodging and burning in are specialized methods of manipulating the appearance of the final print (Tr. 148). %I31"Cropping" is a technique whereby a print is overmagnified so that a print smaller than the overmagnification can be produced. It is a method of eliminating undesired portions of the original print (Tr. 100–01). The record shows that cropping can be accomplished with some Durst printers, *viz.* the M 6/12 automatic cropping printer (Tr. 22–23) and ACS 78 MK2 cropping printer (Tr. 24), which is the high speed version of the Durst Miniprinter (Tr. 25). As in the case of a prototype enlarger, these Durst cropping printers are used for cropping with the aid of an operator (Tr. 92–93).

[7] A "roll easel" is a means of automatically moving the photosensitive paper (Tr. 186–87). It is noted that Durst printers have a built-in easel rather than an accessory easel, which is a separate piece of equipment that can be moved around from one enlarger to another (Tr. 187–88).

with a "commercial designation"—a special interpretation commonly placed upon it by the particular industry involved—rather than common meaning.

Implicit in plaintiff's reliance upon the doctrine of "commercial designation" is the premise that the trade understanding of the tariff term in issue differs from its common meaning. Stated otherwise, the doctrine has no application where the commercial and common meanings are the same. *Stephen Rug Mills* v. *United States*, 32 CCPA 110, C.A.D. 293 (1944); *Draeger Shipping Co.* v. *United States*, 15 Ct. Cust. Appls. 190, T.D. 42234 (1927). Hence, as pointed out in *Excelsior Import Associates, Inc.* v. *United States*, 66 CCPA 1, 2, C.A.D. 1212, 583 F.2d 513, 514, (1978):

> * * * The well-established rule respecting trade sense is that "before the plain understanding of a term can be deviated from it must be shown by plenary proof to have a different import in trade and commerce." *United States* v. *Wells Fargo & Co.*, 1 Ct. Cust. Appls. 158, 161, T.D. 31211 (1911). The Government relied on the plain understanding of the term "ornamented" articles. Thus, appellant had the burden of proving that "ornamented" textile articles, as used in the TSUS, had a *commercial designation or trade sense different from the common meaning or plain understanding of that phrase* * * *. [Emphasis added.]

In *Wells Fargo,* cited in *Excelsior,* the court further expounded upon commercial designation (1 Ct. Cust. Appls. at 161–62):

> It is a rule of statutory interpretation, confined not alone to the customs laws, but running through the universal scope of law, the "words and phrases are assumed to be used in their natural signification" and shall be so construed, the sole exception in customs adjudication being that commercial designation shall obtain over the common and accepted understanding of words where such is duly proven * * *
>
>   *   *   *   *   *   *   *

The legitimate corollary of this often-pronounced rule of interpretation is that no meaning shall be given a word or phrase used in customs laws other than its ordinary or accepted meaning *except upon plenary proof that this extraordinary meaning is fully and completely understood and accepted throughout the United States by all of those dealing wholesale in that class of goods.*

> The rule is based upon the sound principle that customs laws are drawn in view of the lay understanding (first) of the trade subject thereto, and (secondly) for the information of merchants and dealers who are not lawyers, and perchance may not be skilled in the finesse of the English language and who, with a common lay understanding, will be completely informed by the plain words of the statute as drawn by Congress what duties are levied and what penalties they may expect for a violation of the law. [Emphasis added.]

While it is basic that tariff terms presumably carry the meaning given them in trade and commerce (*Ameliotex, Inc.* v. *United States,* 65 CCPA 22, C.A.D. 1200, 565 F.2d 674 (1977): *Esco Manufacturing Co., aka J. Hofert Co.* v. *United States,* 63 CCPA 71, C.A.D. 1167, 530 F.2d 949 (1976)), it is also well settled by a long line of decisions that the language of commerce is presumptively that language in common use. See *e.g., Rosenblad Corp.* v. *United States,* 49 CCPA 81, C.A.D. 800 (1962); *United States* v. *C.J. Tower & Sons of Buffalo, N.Y.,* 48 CCPA 87, C.A.D. 770 (1961); *Floral Arts Studio* v. *United States,* 46 CCPA 21, C.A.D. 690 (1958); *United States* v. *The Specialty House, Inc.,* 42 CCPA 136, C.A.D. 585 (1955); *United States* v. *E. Dillingham, Inc.,* 41 CCPA 221, C.A.D. 555 (1954); *C.J. Tower & Sons* v. United States, 41 CCPA 195, C.A.C. 550 (1954); *Hummel Chemical Co.* v. *United States,* 29 CCPA 178, C.A.D. 189 (1941); and *United States* v. *M.J. Brandenstein & Co.,* 17 CCPA 480, T.D. 43941 (1930).

Since plaintiff maintains that a special commercial meaning of the term "enlarger" excludes printers, plaintiff necessarily assumed the burden of proof on that issue. *United States* v. *Simon Saw & Steel Co.,* 51 CCPA 33, 38 C.A.D. 834 (1964); *The Specialty House, Inc.,* 42 CCPA at 141. Proof of commercial designation is a question of fact to be established in each case. *Tower & Sons* v. *United States,* 11 Ct. Cust. Appls. 261, T.D. 39080 (1922); *Florsheim Shoe Co., Division of Interco, Inc.* v. *United States,* 71 Cust. Ct. 187, C.D. 4495 (1973); *Daniel Green Shoe Co.* v. *United States (Transworld Shoe Corp., Party in Interest),* 58 Cust. Ct. 7, C.D. 2868, 262 F. Supp. 375 (1967). Commercial designation requires proof of the meaning of a term in the trade at the time of the enactment of the statute. *R.J. Saunders & Co., Inc.* v. *United States,* 49 CCPA 87, 89, C.A.D. 801 (1962); *The Hy-Glow Co.* v. *United States,* 58 Cust. Ct. 481, 486, C.D. 3023 (1967).

Consequently, plaintiff had the burden of establishing that, as used in the photographic industry at the time of the enactment of the Tariff Schedules, the term "enlarger" had a meaning which was general (extending over the entire country), definite (certain of understanding), and uniform (the same everywhere in the country). *Moscahlades Bros., Inc.* v. *United States,* 42 CCPA 78, 82, C.A.D. 575 (1954); *United States* v. *M. & D. Miller, Inc.,* 41 CCPA 226, 235, C.A.D. 556 (1954); *Nylos Trading Co.* v. *United States* 37 CCPA 71, 73, C.A.D. 422 (1949); *Stephen Rug Mills,* 32 CCPA at 116. Thus, the doctrine of commercial designation "was intended to apply to cases where the trade designation is so universal and well understood that the Congress, and all the trade, are supposed to have been fully acquainted with the practice at the time the law was enacted". *Jas. Akeroyd & Co.* v. *United States,* 15 Ct. Cust. Appls. 440, 443, T.D. 42641 (1928). *See also United States* v. *Fung Chong Co.,* 34 CCPA 40, 42, C.A.D. 342 (1946); *Heads & Threads, Division of MSL Industries, Inc.* v. *United States,* 60 Cust. Ct. 308, C.D. 3374, 282 F. Supp. 484 (1968).

After careful review of the evidence of record and the legal principles applicable to commercial designation, the court finds that plaintiff failed to adduce any general, definitive and uniform trade understanding for the term "enlarger" that is at variance with the common meaning of the term.

In support of its argument that the imports are not enlargers as that term is commercially understood, plaintiff asserts that they are not called "enlargers" in the photographic trade. But on that score, it should first be pointed out that in plaintiff's own advertising literature and instruction manuals the imports are referred to as "enlarging printers" (plaintiff's exhibits 3 and 7 and defendant's exhibit B, C and D), and they are promoted in the trade as designed to produce "enlargements" or "high quality enlargements" (plaintiff's exhibit 2 and defendant's exhibits A, B and H). Moreover, Durst printers, while not "called" enlargers are "considered" by the professional photographic industry to be enlargers (Tr. 82–83). In any event, even though merchandise is commercially known by a specific name (*viz.*, "printers"), which name differs from a generic tariff description (*viz.*, "enlargers"), is not sufficient to exclude the merchandise from classification under the later designation. *See S.G.B. Steel Scaffolding & Shoring Co., Inc.* v. *United States,* 82 Cust. Ct. 197, 210, C.D. 4802 (1979), and cases cited; *Heads & Threads, supra.*

### Plaintiff's Claim Under Item 722.94

Having concluded that the imports are described by the provision in item 722.18 for enlargers, under which they were classified by Customs, the court must consider whether the imports are also described by the provision claimed by plaintiff, *viz.,* item 722.94 covering photofinishing equipment.

Plaintiff's position if that the printers are described by item 722.94 because they are used as photofinishing equipment. The record substantiates that contention. Defendant, however, urges a highly restrictive interpretation of the provision for photofinishing equipment. According to defendant, the printers are not used as photofinishing equipment because the end product of the printer is a latent image contained on unprocessed photographic paper, which must undergo a chemical "finishing" process. This latter process, defendant insists, is photofinishing, and only the devices used to accomplish it are classifiable as photofinishing equipment. Stated otherwise, defendant's position is that only articles or devices which make the latent image visible, or are used in devices that make the latent image visible, qualify for tariff classification as photofinishing equipment.

The tariff provision for photofinishing equipment is obviously a use provision. Indeed, the record establishes that the production of an enlarged latent image on photosensitive paper from a negative, which is the basic function of enlargers (including Durst printers), is essentially the initial step in "finishing" a photograph. Since this

initial step is part of the photofinishing process, the printers by use are photofinishing equipment, as described in item 722.94. Defendant's interpretation, which limits the provision for photofinishing equipment to only those articles involved in the chemical "finishing" process, is unduly restrictive. This is confirmed in 3 *Summaries of Trade and Tariff Information* (1968), Schedule 7, p. 45,[8] wherein the United States Tariff Commission stated:

> Item 722.94 covers miscellaneous photofinishing equipment ranging from small print tongs (for handling prints) and film clips, to a complete film-processing machine.

*Relative Specificity*

Defendant posits that even assuming Durst printers fall within the provision for photofinishing equipment, they are nevertheless precluded from classification under item 722.94 by the doctrine of relative specificity. The court agrees.

General Interpretative Rule 10(c), TSUS, provides that an imported article which is described in two or more provisions of the tariff schedules is classifiable in the provision that most specifically describes it. This rule has been interpreted to mean that merchandise is classifiable under the tariff provision which is more restrictive and more difficult to satisfy. *Ozen Sound Devices, supra; Arthur J. Humphreys* v. *United States,* 56 CCPA 67, C.A.D. 956, 407 F.2d 417 (1969); *United States* v. *Simon Saw & Steel Co., supra.*

When the competing provisions are an *eo nomine* provision, such as item 722.18 for enlargers, and a use provision with a "not specially provided for" clause, such as item 722.94, the *eo nomine* provision prevails under Rule 10(c). In *Besler,* the Appellate Court stated (64 CCPA at 125):

> Appellees' claimed classification under item 722.94, TSUS, is merely a "not specially provided for" provision for all equipment which is specially designed for still picture photofinishing. It is not a specific *eo nomine* provision, as is the camera provision of item 722.16, TSUS. Absent a clearly shown contrary legislative intent, which is not present in the case at bar, a "not specially provided for" clause in a use provision excludes articles enumerated elsewhere by a description or *eo nomine* designation (citations omitted).

Here, plaintiff has not shown a contrary legislative intent to the application of the doctrine of relative specificity. Therefore, pursuant to Rule 10(c), the court holds that the Durst printers are more specifically provided for under the *eo nomine* provision for enlargers in item 722.18, TSUS, than under the "basket" provision for photofinishing equipment in item 722.94, TSUS.

---

[8] The *Summaries of Trade and Tariff Information* have been frequently referred to as an aid in determining the scope of tariff provisions. *See e.g.: Pistorino & Co., Inc.* v. *United States,* 66 CCPA 95, C.A.D. 1227, 599 F.2d 444 (1979); *American Bristle & Hair Drawing Co. et al* v. *United States,* 59 CCPA 104, C.A.D. 1048, 458 F.2d 524 (1972); *Tanross Supply Co , Inc.* v. *United States* 58 CCPA 26, 31, C.A.D. 1000, 433 F.2d 1332 91970). See also *Lyons Export & Import, Inc.* v. *United States,* 59 CCPA 142, 144, C.A.D. 1056, 461 F.2d 830 (1972); *The Englishtown Corporation* v. *United States,* 64 CCPA 84, C.A.D. 1187, 553 F.2d 1258 (1977).

CONCLUSION

For the foregoing reasons, Customs' classification of the Durst printers as "enlargers" under item 722.18, TSUS, is sustained, and this action is dismissed.[9]

Judgment will be entered accordingly.

---

[9] While in view of the disposition of this case, it is unnecessary to decide the merits of defendant's proposed alternative classification under the provision for cameras in item 722.16, TSUS, the record shows that the printers fall within *Webster's* broad generic definition of "camera" relied upon by the Appellate Court in *Besler* (Tr. 123, 226–27, 253, 272), which held that the *eo nomine* provision for cameras is more specific than the provision for photofinishing equipment in item 722.94. As with the term "enlarger", plaintiff failed to prove a general, definite and uniform commercial designation for the term "camera" that differs from the common meaning of such term.